UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WASTE CONNECTIONS, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>  v.<br><br>SCOTT T. EARL, CLAIRVEST EQUITY PARTNERS III L.P., CEP III CO-INVESTMENT L.P., JAMES HORVATH, ANGELA HORVATH, PAOLA HORVATH, and ERNEST PALMER,<br><br>        Defendants. | Civil Action No.: 1:14-CV-1258 [MAD/RFT]<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Waste Connections, Inc. ("WCI") brings this Complaint against Defendants Scott T. Earl, Clairvest Equity Partners III, L.P., CEP III Co-Investment L.P., James Horvath, Angela Horvath, Paola Horvath and Ernest Palmer (collectively "Defendants"), alleging as follows:

<u>INTRODUCTION</u>

1.     In 2011, Plaintiff WCI paid over three hundred million dollars to purchase from Defendants the stock of several companies engaged in the solid waste and recycling business in the Albany, New York region. A few months after the sale, WCI learned for the first time that Defendants, in particular Defendant Scott Earl, had concealed large and growing liabilities of the acquired companies to a group-self-insured workers' compensation trust over which the State of New York subsequently assumed control. Defendants failed to disclose the acquired companies' membership in the trust in a highly detailed 2011 stock purchase agreement between them and WCI, and affirmatively represented that no trust liabilities of this nature existed at the time of sale. In fact, the New York State Workers' Compensation Board has calculated that the deficiencies in

the trust exceed thirty million dollars.  Despite their obligation to do so, for over two years Defendants have refused to indemnify WCI for liabilities associated with the trust.  WCI brings this action to enforce the indemnification obligations owed by Defendants under the stock purchase agreement and common law, for a declaratory judgment, for breach of contract and fraud, and for all attendant damages.

## BACKGROUND FACTS

2.      On March 31, 2011, WCI and Defendants executed a Stock Purchase Agreement ("SPA") through which WCI purchased a group of companies engaged in the collection, transport, and processing of solid waste and recyclables in the Albany, New York area, by acquiring from Defendants all of the issued and outstanding capital stock of Hudson Valley Waste Holding, Inc. ("Hudson Valley Waste"), a Delaware corporation, and its subsidiary companies.

3.      Hudson Valley Waste's subsidiary companies included: (i) County Waste and Recycling Service, Inc. ("County Waste"), a direct subsidiary of Hudson Valley Waste and (ii) RKS Holding Corp., County Waste Transfer Corp., County Waste-Ulster, LLC, Carpenter Waste Holdings, LLC, Sterling Avenue Properties, LLC, Fort Ann Transfer Station, LLC, Sierra Holding Group, LLC, Russell Sweepers, LLC, Sierra Processing, LLC, Clifton Organics, LLC, and Marketable Materials, LLC, each a direct or indirect subsidiary of County Waste (collectively, with Hudson Valley Waste and County Waste, the "Hudson Valley Group Companies" or "HVCs").

4.      WCI paid over $300,000,000 for the HVCs, based, in large part, on the truth of Defendants' representations and warranties in the SPA and the accuracy and completeness of the Defendants' corresponding disclosures in the Schedules to the SPA.

5.      Defendants, however, failed to disclose sizeable liabilities, and Defendants' corresponding representations and warranties, which survived the April 1, 2011 closing ("Closing" or "Closing Date"), were false.  Defendants must now indemnify WCI.

2

6.      Between 1996 and December 31, 2010, many of the HVCs became members of a group self-insurance workers' compensation trust ("GSIT") called TEAM Transportation Workers' Comp Trust ("TEAM Trust" or "Trust"), organized under the laws of the State of New York and overseen by the New York State Workers' Compensation Board (the "WCB" or "Board").  The Trust enabled companies in the industry to obtain their required workers' compensation insurance.

7.      Well before Defendants made representations and warranties in the SPA that liabilities such as the TEAM trust liabilities did not exist, the WCB had determined that the Trust was underfunded.

8.      Indeed, due to the Trust's severely underfunded status, the TEAM trustees (including Defendant Earl) voted in 2010 to close the Trust.

9.      To date, the WCB has issued over $32,000,000 in deficiency assessments to the TEAM Trust members to correct this legacy underfunding.  To date, the WCB has issued individual assessments to several HVCs and other companies the WCB believes are affiliated with the HVCs totaling $4,918,947.39 for deficits incurred and not funded by Defendants between 1996 and 2010.  To date, the WCB has included in the $4,918,947.39 deficit assessment at least $49,044.12 in accrued interest.

10.      Had it known of this liability before Closing, WCI would have taken several possible actions to protect its position, including: negotiating a lower purchase price, seeking a large escrow to fund the TEAM Trust liability, including the Trust liability as an excluded liability (for which the former Shareholders would remain liable after the Closing), or deciding not to proceed with the purchase.

11.      Defendants deprived WCI of the opportunity to take any such measures because they misrepresented and failed to disclose the status of the HVCs' Trust liabilities.  By failing to disclose any information in the SPA or the Schedules thereto related to the TEAM Trust liability

3

and misrepresenting in the SPA that no such liability existed, Defendants breached their express representations and warranties.

12.      Moreover, Defendants knew when they made these express representations and warranties that they were inaccurate and false.

13.      Pursuant to the SPA's contractual indemnification clause, Defendants have an obligation to indemnify WCI for all Damages, as defined in the SPA, associated with the TEAM Trust deficiencies, which include without limitation all costs and fees (including attorneys' fees and costs of investigation) incurred in connection with this action.  Defendants have breached their obligations under the SPA by refusing to indemnify WCI for any TEAM Trust deficiencies.

## JURISDICTION AND PARTIES

14.      Waste Connections, Inc. is a Delaware corporation with its principal place of business in the State of Texas.

15.      Upon information and belief, Defendant Scott T. Earl ("Defendant Earl") is a resident of the State of Florida or New York and can be found at 4 Enterprise Ave. Clifton Park NY 12065.

16.      Upon information and belief, Defendant Clairvest Equity Partners III L.P. ("Clairvest Equity"), is an investment arm of Clairvest Group Inc. ("Clairvest"), a Canadian corporation traded on the Toronto Stock Exchange, with its principal place of business in Toronto, Ontario.

17.      Upon information and belief, Defendant CEP III Co-Investment L.P. ("CEP"), is a fund of Clairvest Group Inc., a Canadian corporation traded on the Toronto Stock Exchange, with its principal place of business in Toronto, Ontario.

18.      Upon information and belief, Defendants James and Paola Horvath are residents of the State of New York, residing at 5 Meadowview Lane, Schenectady, New York 12306.

4

19.     Upon information and belief, Defendant Angela Horvath is a resident of the State of New York, residing at 17 Osage Trail, Spencerport, New York 14559.

20.     Upon information and belief, Defendant Ernest Palmer is a resident of the State of New York, residing at 2102 Hugh Street, Schenectady, New York 12306.

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  This Court has jurisdiction over this declaratory judgment action under the Declaratory Judgment Act, 28 U.S.C § 2201 *et seq*.

22.     This Court has personal jurisdiction over Defendant Earl because he owned and operated the HVCs, participated in negotiations over the SPA in New York, continues to operate commercial enterprises and own property in New York, and his contacts with New York are sufficient such that exercising jurisdiction over him would not offend traditional notions of fair play and justice.

23.     This Court has personal jurisdiction over Defendants Clairvest Equity and CEP because they owned a substantial share of the HVCs, participated in negotiations over the SPA in New York, and their contacts with New York are sufficient such that exercising jurisdiction over these entities would not offend traditional notions of fair play and justice.

24.      This Court has personal jurisdiction over Defendants James and Paola Horvath, Angela Horvath and Ernest Palmer because they are each residents of the State of New York. Upon information and belief, Defendant Scott Earl is also a resident of the State of New York.

## **VENUE**

25.     Venue is proper in the Northern District of New York under 28 U.S.C. § 1391 because this is the district in which a substantial part of the events and omissions giving rise to this

action occurred, in which the businesses at issue in this action operate, and in which Defendants James and Paola Horvath, and Ernest Palmer reside.

## ADDITIONAL FACTS

### *The TEAM Trust was Chronically Underfunded*

26.     The TEAM Trust was established on or about October 15, 1995 by several companies including employers involved in the transportation industry that conducted business in New York State.  The Trust's charter members included County Waste, then owned, either in whole or in part, by Defendant Earl.

27.     The terms of the Self-Insurance Agreement and Declaration of Trust, the Indemnity Agreement, and the By-Laws of the Trust (collectively the "Trust Documents"), state that the Trust members are jointly and severally liable for all workers' compensation obligations incurred by the Trust.

28.     Each participating member of the Trust was required to execute a "Participation Agreement," which states that members are jointly and severally liable for all workers' compensation obligations incurred by the Trust.

29.     Between 1995 and 2011, several of the HVCs (County Waste, County Waste-Ulster, LLC, County Waste Transfer Corp., Marketable Materials, LLC, Fort Ann Transfer Station, LLC, Sierra Processing, LLC, Carpenter Waste Holdings, LLC and Sierra Holding Group, LLC (f.k.a. Sierra Recycling Group, LLC)) joined the TEAM Trust as members.

30.     Defendant Earl served as a trustee of the TEAM Trust during various time periods between March 1995 and May 2011 and, upon information and belief, as a trustee and member-owner he was kept informed of the financial status of the Trust.

31.     From approximately August 1, 2006, until January 31, 2012, the TEAM Trust was administered by Program Risk Management, Inc. ("PRM").

1093837v.1

32.     Under New York law, 12 N.Y.C.R.R. § 317 *et seq.*, a GSIT is required to be fully funded, meaning the GSIT must be funded with unrestricted cash and permitted investments in an amount equaling at least one hundred percent (100%) of the GSIT's anticipated liabilities.

33.     Prior to 2009, the WCB allowed GSITs to grow their membership and to use appropriate discounts if their audited financial statements revealed a trust equity ratio of 90% or more.  If this ratio was less than 90%, then the WCB subjected GSITs to greater scrutiny, which could include restricting membership and discounts.

34.     On or about July 14, 2005, the WCB calculated the TEAM Trust's December 31, 2004 trust equity ratio to be 78.6%.  The WCB deemed the Trust to be underfunded as of that date.

35.     On or about September 29, 2006, the WCB calculated the TEAM Trust's December 31, 2005 trust equity ratio at 74%.  The WCB deemed the Trust to be underfunded as of that date.

36.     Subsequently, the WCB entered into a consent agreement with the Trust that required the Trust to achieve breakeven results for 2007.

37.     On or about June 1, 2007, the WCB calculated the TEAM Trust's December 31, 2006 trust equity ratio at 84.4%.  The WCB deemed the Trust to be underfunded as of that date.

38.     Subsequently, the WCB entered a new consent agreement with the Trust that required the Trust to achieve breakeven results for 2008.

39.     On or about September 5, 2008, the WCB calculated that the Trust achieved a December 31, 2007 trust equity ratio of 95.7%.  The WCB rescinded the consent agreement and found that the Trust had "no funding issues" at that time.

40.     The Trust apparently continued to maintain the minimum 90% trust equity ratio through 2008.

41.     However, at a May 12, 2010 meeting of the TEAM trustees, a representative of Bonadio & Co., LLP, the Trust's accounting firm, acknowledged that the Trust was not fully

7

funded under the WCB's funding calculation. In addition, the trustees discussed each member's joint and several liability under the Participation Agreement if the Trust were to close.

42.     On or about July 29, 2010, the WCB calculated the TEAM Trust's December 31, 2009 trust equity ratio at 76.4%. The WCB deemed the Trust to be underfunded again as of that date.

43.     On or about October 12, 2010, the TEAM Trust trustees held a meeting, which was attended by Defendant Earl. By unanimous vote, the trustees decided to recommend closure of the Trust to its membership.

44.     A December 2010 letter from the TEAM Trust administrator to all members, and specifically County Waste and Defendant Earl, stated that the members each remained jointly and severally liable for Trust obligations even after closure of the Trust.

45.     The Trust subsequently closed on January 1, 2011, at which time it was still underfunded. The Trust then entered a run-off period during which the WCB monitored the Trust's monthly cash.

46.     After its closure, the Trust stopped providing coverage to its members, but was still required to meet all workers' compensation obligations that had accrued prior to its closure and that are payable directly to the injured employees.

47.     The WCB has asserted that in or about 2011, the TEAM Trust had approximately $1,000,000 of outstanding accounts receivable from Trust members.

48.     The WCB has further asserted that the trustees, with knowledge that the Trust had a regulatory deficit, wrote off the $1,000,000 of accounts receivable as bad debt without taking any action to recover the outstanding balance due or assess the other TEAM Trust members, which resulted in insufficient trust assets and the further underfunding of the Trust.

49.     Because all TEAM Trust deficits arose before 2011, the WCB has asserted that the liability for these deficits existed upon Trust closure on January 1, 2011, and all assessments are based on obligations arising before that date. The SPA preserves that liability and puts the

responsibility for these past liabilities on Defendants, not on WCI.  Consequently, Defendants must indemnify WCI for those liabilities.

### Negotiation of the Stock Purchase Agreement in 2011

50.     WCI and Defendants commenced negotiation of the SPA in February 2011.  The parties executed the final SPA on March 31, 2011 ("Signing Date"), and the transaction closed on April 1, 2011.  WCI agreed to pay Defendants a purchase price of $299,000,000.00, subject to adjustment based on a Closing Date reconciliation of assets and liabilities (the "Purchase Price").  In the SPA, Defendant Scott Earl was referred to as the "Principal Shareholder."  The SPA collectively refers to all the other Defendants as the "Outside Shareholders."  *See* SPA, p. 1, attached as Exhibit 1.

51.     As is typical in transactions of this size, the SPA contained numerous conditions, representations and warranties upon which the negotiated Purchase Price and sale was based.  (*See* SPA, Art. 3).  The SPA also contained a number of Schedules, which consisted of disclosures and documents supporting, among other things, the representations and warranties contained in Article 3 of the SPA.  *See* SPA, Schedules 3.14 & 3.16.

52.     Subsequent to the Closing Date, WCI learned that several of Defendants' representations and warranties were false as of both the Signing Date and the Closing Date.

### Defendants Concealed and Misrepresented the TEAM Trust Liabilities

53.     Defendants made express representations and warranties that were material inducements to WCI's agreement to pay the Purchase Price.  Defendants' representations and warranties are contained in Article 3 of the SPA.  Defendant Earl, as Principal Shareholder, represented and warranted that every single representation and warranty in Article 3 of the SPA was true and correct as of the Signing Date and would be true and correct as of the Closing Date.  *See* SPA, Art. 3.

54.     Article 3 of the SPA included the following representation and warranty:

Schedule 3.14 lists, and includes copies of, all material contracts and agreements . . . to which any Hudson Valley Group Company is a party or by which it or any of its property or equity . . . is bound . . . including . . . (iv) **indemnification agreements**, guarantees, suretyships or **obligations to assure or incur any obligation of a third party** . . . and (ix) any **other agreements**, contracts or **commitment that involves or could result in** aggregate payments to or by the Hudson Valley Group Companies in any twelve-month (12-month) period of Two Hundred Fifty Thousand Dollars ($250,000)."

SPA § 3.14 (emphasis added).

55.     Schedule 3.14 failed to include any TEAM Trust Participation Agreements or Trust Documents or any related disclosures.

56.     The SPA designated several of the representations and warranties in Article 3 as "Absolute Representations" and, in addition to Defendant Earl's representations and warranties related to Article 3 noted above, the other Defendants, as Outside Shareholders, "severally but not jointly" represented and warranted that each of the Absolute Representations was true and correct as of the Signing Date and would be true and correct as of the Closing Date.  (*See* SPA, Art. 3).

57.     Article 3 of the SPA included the following Absolute Representation:

"Except to the extent included in Closing Date Current Liabilities, no Hudson Valley Group Company has . . . (ii) **any obligation or liability for any payment to any trust** or other fund or to any governmental or administrative authority, with respect to unemployment compensation benefits, social security or **other benefits for employees** (other than routine payments to be made in the normal course of business and consistent with past practice)."

SPA § 3.16(d) (emphasis added).

58.     The Closing Date Current Liabilities as set forth in Schedule 3.22(b) did not include the TEAM Trust liabilities or any related disclosures.

59.     Each of these representations was false (and knowingly false) when made and at the time of Closing.

60.     Defendants negligently and, upon information and belief, intentionally or in the alternative recklessly and under circumstances not justifying belief in their truth, made the

misrepresentations and omissions described above regarding Trust Documents and the status of the TEAM Trust obligations.

61.     Prior to Closing, the WCB sent numerous communications to Defendants related to the compliance status of the TEAM Trust, but Defendants failed to disclose them to WCI.

62.     Defendants negligently and, upon information and belief, intentionally or in the alternative recklessly, failed to disclose the WCB's correspondence and investigation into the TEAM Trust funding problems as well as the fact that the WCB had found the TEAM Trust to be underfunded as of December 31, 2010.

63.     The Schedules are an integral component of the SPA.  The importance of the Schedules in relation to WCI's reliance on the representations and warranties set forth in Article 3 of the SPA is reinforced by Section 5.6(b) of the SPA, which provides in part that the Schedules to the SPA "shall be accurate and complete when delivered on or prior to the Signing Date."  SPA § 5.6(b).

64.     Further, all of Defendants agreed the "representations and warranties set forth in Articles 3 and 4 shall survive the Closing."  SPA § 10.6.

65.     As addressed in more detail below, in October 2011, PRM issued deficit assessments to the former members of the TEAM Trust, including the HVC members, applicable to the period from 2008 through 2010 (*i.e.*, prior to the Closing).  This communication and subsequent action by the WCB prompted WCI to review the WCB's records pertaining to the TEAM Trust.

66.     Through its review of the WCB's records, WCI identified correspondence among the WCB, the TEAM Trust administrators, the Trust's trustees, and the Trust members regarding underfunding of the Trust before 2011.  WCI's review after the Closing revealed that the WCB had issued several notices of underfunding and entered into several consent agreements, as detailed in this Complaint.

67.     Defendants never disclosed to WCI any information regarding the Trust or the members' obligations thereto, and never disclosed that the HVCs had outstanding liabilities relating to the Trust.

68.     Moreover, Defendants never disclosed to WCI the WCB's inquiries or investigations into the Trust deficits, and never disclosed to WCI the WCB's directives to the Trust members to correct the Trust deficits.

69.     Even if Defendants had made a disclosure in the Disclosure Schedule to qualify any Absolute Representation, Defendants are still liable for indemnification of all Damages arising from or in connection with the subject matter claimed to be disclosed "as if the disclosure had not been made."  SPA § 10.4(b).

70.     Defendants' failure to disclose these key facts violates their representations and warranties under Article 3 of the SPA.

71.     Damages arising from a breach of an Absolute Representation constitute an "Absolute Obligation" that is not subject to the "General Deductible Amount" or the "Minimum Claim Amount" set forth in SPA § 10.4(a).

72.     Further, damages arising from a breach of an Absolute Representation constitute an Absolute Obligation that is not subject to the "General Indemnity Cap" set forth in SPA § 10.4(b).

73.     The SPA defines "Misconduct" to mean fraud, fraudulent inducement, misappropriation or intentional misrepresentation or concealment.  *See* SPA § 10.4(b).

74.     Because Defendant Earl was aware of the TEAM Trust liabilities, his misrepresentations were intentional, or in the alternative reckless, and constituted Misconduct under the SPA.

75.     Because the other Defendants (the Outside Shareholders) were aware of the TEAM Trust liabilities, upon information and belief their misrepresentations were intentional, or in the alternative reckless, and constituted Misconduct under the SPA.

76.     Damages arising from Misconduct are not subject to the General Deductible Amount or the Minimum Claim Amount set forth in SPA § 10.4(a); nor are they subject to the General Indemnity Cap or the Absolute Indemnity Cap set forth in SPA § 10.4(b).

### *Plaintiff is Entitled to Indemnity Protection Under the SPA for All Damages Incurred*

77.     In addition to his representations and warranties, and as further protection for WCI with regard to the acquisition of the HVCs, Defendant Earl, as Principal Shareholder, agreed to generally indemnify WCI "from and after the Signing Date, against any and all losses, damages (including exemplary damages), assessments, fines, penalties, adjustments, liabilities, claims, deficiencies, costs and expenses (including specifically, reasonable attorneys' fees, court costs, witness fees and expenses of investigation) (collectively, 'Damages'), suffered or incurred by any WCI Indemnitee arising from, in connection with or related to any of the events, matters or contingencies set forth below or in Section 10.2 (each, a 'WCI Indemnity Event', and collectively, the 'WCI Indemnity Events'):

> (a)  Any misrepresentation, breach of warranty, or nonfulfillment of any agreement or covenant on the part of any Shareholder of any Hudson Valley Group Company pursuant to the terms of this Agreement or any Exhibit or Schedule attached hereto.
> . . .
>
> (c)  Any actions, suits, arbitrations, proceedings, demands, assessments, adjustments, costs and expenses (including specifically, reasonable attorneys' fees and expenses of investigation) incident to any for the foregoing."

SPA § 10.1 (underscoring in original).

78.     In addition to their representations and warranties, and as further protection for WCI with regard to the acquisition of the HVCs, all Defendants (including the Defendants who are Outside Shareholders) also agreed to generally indemnify WCI "from and after the Signing Date, against any and all Damages suffered or incurred by any WCI Indemnitee arising from, in connection with or related to any WCI Indemnity Event set forth below (collectively, the 'Absolute Obligations'): (a) Any misrepresentation or breach of representation or warranty set

forth in Section . . . 3.16(d) [pertaining to employee benefit trust obligations, and] . . . (e) Any actions, suits, arbitrations, proceedings, demands, assessments, adjustments, costs and expenses (including specifically, reasonable attorneys' fees and expenses of investigation) incident to any of the foregoing."  SPA § 10.2.

79.     WCI, its Affiliates including the HVCs, and their respective directors, officers, agents, successors and assigns are "WCI Indemnitees" under the SPA.  SPA § 10.1.

80.     The SPA imposes an obligation on Defendant Earl to indemnify WCI for damages arising from his breach of SPA §§ 3.14 and 5.6(b) related to his failure to disclose the TEAM Trust Participation Agreements or Trust Documents or make any related disclosures.

81.     The SPA imposes an Absolute Obligation on all Defendants to indemnify WCI for the claims and deficiencies, including attorneys' fees and expenses of investigation, associated with the TEAM Trust assessments based on their breach of the Absolute Representation set forth in SPA § 3.16(d) by failing to disclose the HVCs' obligations to the TEAM Trust existing before and at the time of Closing.

### WCI Gave Notice to the Defendants and They Denied Their Indemnity Obligations

82.     As set forth in SPA § 10.6, the indemnification obligations under Sections 10.1 and 10.2 of the SPA survive the Closing and, upon delivery of notice pursuant to SPA § 10.5, shall not terminate by operation of any provision of the SPA.

83.     Specifically, the SPA states:

> For the avoidance of doubt, no obligation of an Indemnifying Party to indemnify and hold harmless an Indemnitee hereunder shall terminate with respect to any matter as to which the Indemnitee shall have, before the expiration of the applicable period, previously made a claim by delivering a notice (stating in reasonable detail the basis of such claim) to the Indemnitee.

SPA § 10.6.

84.     Less than seven months after Closing, on October 27, 2011, PRM issued a member deficit assessment of approximately $3.5 million to the former members of the TEAM Trust.  The

HVCs, in particular, received an assessment applicable to the period from 2008 through 2010 then totaling $865,982.78.  This was the first time WCI learned of the TEAM Trust liabilities.

85.     In December 2011, the WCB notified the Trust that due to the Trust's failure to properly administer its liabilities, the WCB would assume administration of the Trust, effective February 1, 2012.  The WCB sent a letter dated January 20, 2012, to former members of the TEAM Trust informing them that the WCB had determined that the Trust was in a significant deficit position, which would impair the Trust's ability to pay future claims and expenses.

86.     On or about February 1, 2012, the WCB assumed control of the Trust's liabilities and operations.  SAFE, LLC replaced PRM as the TEAM Trust administrator.  In order to determine more precisely the overall amount of funds needed to fully fund the Trust, the WCB commissioned a forensic analysis of the Trust by the accounting firm Lumsden & McCormick, LLP.

87.     To exercise its right to indemnity and the protections afforded by the SPA, on February 9, 2012, WCI served a Notice of Claim letter pursuant to Section 10.5 of the SPA.  In its Notice of Claim, WCI identified the breaches of contract and fraudulent misrepresentations described above (a copy of WCI's Notice of Claim is attached as Exhibit 2).  Pursuant to SPA §§ 10.5(a) and 9.7(a), the Notice of Claim was addressed to Defendant Earl and Mr. Michael Castellarin, who together are the designated Shareholders' Representatives to receive the Notice of Claim under SPA § 10.5(a) for all Shareholders.

88.     In addition, the Notice of Claim letter pointed out that no Defendant had provided any disclosure in the SPA with respect to any potential underfunding or deficiency of the TEAM Trust or allegations or liabilities in connection therewith, nor were any materials related to this matter provided to WCI prior to or on the Closing Date.  The Notice of Claim letter further alerted Defendants that, at a minimum, the failure to disclose these matters constituted a breach of the Defendants' various representations and warranties made to WCI pursuant to Article 3 of the SPA.

89.     The Notice of Claim letter informed Defendants that their breach had damaged WCI and that WCI is entitled to indemnification for these Damages under the SPA.

90.     By letter dated March 7, 2012, WCI received a response to its Notice of Claim from Defendants' counsel.  (A copy of Defendants' response is attached as Exhibit 3.)  In that letter, Defendants denied that any breach of any representation or warranty had occurred and refused to indemnify WCI for any damages related to WCI's claim.  Defendants then stated that they would assume the defense of the Third Party Claim relating to the TEAM Trust.

91.     By letter dated March 9, 2012, WCI responded to the March 7, 2012, letter from Defendants' counsel.  In its March 9th reply, WCI recognized that the Shareholders' Representatives had exercised their right to assume the defense of the Third Party Claim relating to the TEAM Trust.  WCI emphasized that Defendants' breach of the representations and warranties included the Absolute Representation in SPA § 3.16(d), which provided a basis for the Shareholders' collective indemnity obligations under Section 10 of the SPA.  WCI further noted that the disclosures in Schedule 3.15 were incomplete as they made no reference to the underfunding of the TEAM Trust.  WCI specifically asserted that Defendants knew of the liability and put Defendants on notice that their actions demonstrated intentional misrepresentation and concealment.  (A copy of WCI's reply is attached as Exhibit 4.)

92.     By letter dated April 30, 2012, on behalf of its subsidiaries, WCI received from the WCB modified deficit assessments.  The WCB included invoices to the HVCs and required payment within thirty (30) days.  Defendants have made no payments against the deficit assessments and have refused to indemnify WCI.

93.     Over two years later, on or about June 6, 2014, Lumsden & McCormick, LLP completed its forensic analysis of the TEAM Trust and issued a revised deficit for the Trust.

94.     Based on this forensic analysis, the WCB now seeks to recoup the total deficit of the Trust, which the WCB estimates is in excess of $32,523,422 plus interest.  Based on the terms of the Trust By-Laws, the WCB asserted that the HVCs, as former members of the Trust, are

16

jointly and severally liable for the entire amount of the deficit assessed by the WCB.  On or about July 1, 2014, the WCB issued revised deficit assessment invoices to the HVCs.  The newly issued assessments dramatically increased the amount due and owing by the HVCs, to over $4.9 million.

95.     The July 1, 2014, deficit assessment includes at least $49,044.12 in interest attributed to pre-2011 deficits.  The interest continues to accrue until the deficit is paid.

96.     The deficit assessment is presently due and owing, and constitutes a WCI Indemnitee Event under the SPA thereby triggering Defendants' obligation to indemnify and hold harmless WCI for the full liability sought by the WCB.

97.     WCI has performed all of its duties and obligations under the SPA.

## COUNT I: Breach of Contract – Absolute Representations in SPA § 3.16(d)
## (as to All Defendants)

98.     WCI incorporates Paragraphs 1-97 as if fully set forth herein.

99.     Pursuant to the terms of the SPA, Defendants expressly warranted and represented that none of the HVCs had "any obligation or liability for any payment to any trust or other fund[,] with respect to unemployment compensation benefits, social security or other benefits for employees."  This was an Absolute Representation.  At the time these representations were made, the HVCs had an existing obligation and liability to the TEAM Trust.

100.     Defendants breached the SPA by making a false Absolute Representation under SPA § 3.16(d).

101.     These misrepresentations and omissions were material as evidenced by the provision requiring Defendants to indemnify WCI for any and all Damages suffered or incurred by WCI in connection with or related to any misrepresentation or breach of any representation or warranty in the SPA, and specifically the breach of an Absolute Representation.

102.     Defendants' breach of the SPA caused WCI to overvalue the HVCs and overpay for their capital stock, thereby damaging WCI in an amount to be proven at trial.

17

103.    Defendants' breach of the SPA caused WCI to incur liability for TEAM Trust deficit assessments, thereby damaging WCI in an amount to be proven at trial, but at least $4,918,947.39.

104.    Defendants knowingly and intentionally made the misrepresentations described above regarding the absence of any Trust obligations.  Further, Defendants knowingly and intentionally failed to disclose the WCB's correspondence and investigation into the TEAM Trust funding problems as well as the fact that WCB had found the TEAM Trust to be underfunded as of January 1, 2011.

105.    Defendants' conduct constitutes Misconduct because Defendants knowingly and intentionally failed to disclose the Trust liability, or any information related to the underfunding of the Trust.

106.    Damages arising from Misconduct are not subject to the General Deductible Amount nor the Minimum Claim Amount set forth in SPA § 10.4(a), nor are they subject to the General Indemnity Cap nor the Absolute Indemnity Cap set forth in SPA § 10.4(b).

107.    Therefore, WCI is entitled to indemnification by Defendants for all Damages incurred as a result of this breach.

### **COUNT II: Breach of Contract – Representations in SPA § 3.14**
### **(as to Defendant Earl)**

108.    WCI incorporates Paragraphs 1-107 as if fully set forth herein.

109.    Pursuant to the terms of the SPA, Defendant Earl expressly warranted and represented that he had disclosed all material contracts and agreements including "indemnification agreements" and other agreements or commitments that "involv[e] or could result in aggregate payments" by the HVCs in any twelve-month (12-month) period of $250,000.

110.    Defendant Earl breached the SPA by failing to disclose, in Schedule 3.14 or any other Schedule to the SPA, the Trust Documents, including the By-Laws of the Trust, and the Indemnity Agreement.  By failing to disclose these documents, Defendant Earl also breached the

covenant in SPA § 5.6(b) that the "Schedules shall be accurate and complete when delivered on or prior to the Signing Date." (*See* SPA § 5.6(b)).

111.    Defendant Earl's breaches of the SPA caused WCI to overvalue the HVCs and overpay for their capital stock, thereby damaging WCI in an amount to be proven at trial.

112.    Defendant Earl's breaches of the SPA caused WCI to incur liability for TEAM Trust deficit assessments, thereby damaging WCI in an amount to be proven at trial, but at least $4,918,947.39.

113.    Defendant Earl knowingly and intentionally made the misrepresentations described above regarding the status of the TEAM Trust documents.  Further, Defendant Earl knowingly and intentionally failed to disclose the WCB's correspondence and investigation into the TEAM Trust funding problems as well as the fact that WCB had found the TEAM Trust to be underfunded as of January 1, 2011.  Prior to the Closing, Defendant Earl had received numerous undisclosed communications from the WCB related to the compliance status of the TEAM Trust.

114.    Furthermore, Defendant Earl was a Trustee of the TEAM Trust, and knew or should have known about the TEAM Trust's funding problems.

115.    These misrepresentations and omissions were material, as evidenced by the provision requiring Defendant Earl to indemnify WCI for any and all Damages suffered or incurred by WCI in connection with or related to any misrepresentation or breach of any representation or warranty in the SPA.

116.    Defendant Earl's conduct constitutes Misconduct because Defendant Earl knowingly and intentionally failed to disclose the Trust Documents, including the By-Laws of the Trust, and the Indemnity Agreement.

117.    Damages arising from Misconduct are not subject to the General Deductible Amount or the Minimum Claim Amount set forth in SPA § 10.4(a); nor are they subject to the General Indemnity Cap or the Absolute Indemnity Cap set forth in SPA § 10.4(b).

118.     Therefore, WCI is entitled to indemnification by Defendant Earl for all Damages incurred as a result of these breaches.

### COUNT III: Declaratory Judgment – Contractual Indemnification Obligations
### (as to All Defendants)

119.     WCI incorporates Paragraphs 1-118 as if fully set forth herein.

120.     Any misrepresentation or breach of any Absolute Representation on the part of the Principal Shareholder or any Outside Shareholder pursuant to the terms of the SPA constitutes a "WCI Indemnity Event" triggering Defendants' obligations to indemnify and hold harmless WCI against any and all Damages.  SPA § 10.2.

121.     Defendants' breach of the representations in Sections 3.16(d) of the SPA is a WCI Indemnity Event triggering Defendants' indemnification obligations.

122.     The costs, liabilities and expenses arising from or related to the Trust assessments incurred by the WCI Indemnitees are WCI Indemnitee Events for which Defendants are obligated to indemnify WCI.

123.     The TEAM Trust deficit assessments issued by the WCB and the HVCs' underlying legacy liability to the Trust for pre-2011 underfunding are Damages suffered or incurred by the WCI Indemnitees arising from, in connection with or related to Defendants' misrepresentations and breaches of the SPA.

124.     The costs, liabilities and expenses arising from or related to the Trust assessments incurred by the WCI Indemnitees are Damages suffered or incurred by the WCI Indemnitees arising from, in connection with or related to Defendants' misrepresentations and breaches of the SPA.

125.     WCI has satisfied its duty to notify Defendants of its claims under the SPA's indemnification provisions.

126.     WCI has performed any and all conditions precedent to obtaining indemnification from Defendants pursuant to the SPA § 10.2 for all Damages alleged in this complaint.

127.    Defendants have refused to honor their contractual obligations to indemnify WCI.

128.    Interest has accrued and will continue to accrue on the unpaid deficits.

129.    By reason of the foregoing, an actual and justiciable controversy exists between WCI and Defendants with respect to WCI's entitlement to indemnification under the SPA, including its right to attorneys' fees and other expenses and costs.

130.    The parties are in need of a declaratory judgment declaring WCI's ongoing rights to indemnification.

131.    Therefore, this Court should issue WCI a judicial declaration that WCI is entitled to be indemnified by Defendants under the SPA for all TEAM Trust deficit assessments issued by the WCB to any of the WCI Indemnitees, or as the WCB may modify them, as well as all costs, liabilities and expenses arising from or related to the Trust assessments.

### <u>COUNT IV: Declaratory Judgment – Contractual Indemnification Obligations</u>
### <u>(as to Defendant Earl)</u>

132.    WCI incorporates Paragraphs 1-131 as if fully set forth herein.

133.    Any misrepresentation, breach of warranty, or nonfulfillment of any agreement or covenant on the part of the Principal Shareholder or any Outside Shareholder pursuant to the terms of the SPA or any Exhibit or Schedule attached thereto constitutes a WCI Indemnity Event for which Defendant Earl, as Principal Shareholder, owes an obligation to indemnify and hold harmless WCI against any and all Damages.  SPA § 10.1.

134.    Defendant Earl's breaches of the representations in SPA §§ 3.14 and 5.6(b) are WCI Indemnity Events triggering Defendant Earl's indemnification obligations.

135.    The costs, liabilities and expenses arising from or related to the Trust assessments incurred by the WCI Indemnitees are WCI Indemnitee Events for which Defendant Earl is obligated to indemnify WCI.

136.    The TEAM Trust deficit assessments issued by the WCB and the HVCs' underlying legacy liability to the Trust for pre-2011 underfunding are Damages suffered or

incurred by the WCI Indemnitees arising from, in connection with or related to Defendant Earl's misrepresentations and breaches of the SPA.

137.    The costs, liabilities and expenses arising from or related to the Trust assessments incurred by the WCI Indemnitees incident to this action are Damages suffered or incurred by the WCI Indemnitees arising from, in connection with or related to Defendant Earl's misrepresentations and breaches of the SPA.

138.    WCI has satisfied its duty to notify Defendant Earl of its claims under the SPA's indemnification provisions.

139.    WCI has performed any and all conditions precedent to obtaining indemnification from Defendant Earl pursuant to the SPA § 10.1 for all Damages alleged in this complaint.

140.    Defendant Earl has refused to honor his contractual obligations to indemnify WCI.

141.    Interest has accrued and will continue to accrue on the unpaid deficits.

142.    By reason of the foregoing, an actual and justiciable controversy exists between WCI and Defendant Earl with respect to WCI's entitlement to indemnification under the SPA, including their right to attorneys' fees and other expenses and costs.

143.    The parties are in need of a declaratory judgment declaring WCI's ongoing rights to indemnification.

144.    Therefore, this Court should issue judicial declaration that WCI is entitled to be indemnified by Defendant Earl under the SPA for all TEAM Trust deficit assessments issued by the WCB to any of the WCI Indemnitees, or as the WCB may modify them, as well as all costs, liabilities and expenses arising from or related to the Trust assessments.

## COUNT V: Negligent Misrepresentation

### (as to All Defendants)

145.    WCI incorporates Paragraphs 1-144 as if fully set forth herein.

146.    Defendants owed WCI a duty to act with reasonable care in connection with their representations and warranties made in the SPA, and to conduct due diligence to determine the accuracy of information contained in the SPA and the Schedules thereto.

147.    Defendants breached their duties by negligently including false representations and warranties, including false Absolute Representations, and omitting material documents and disclosures in order to prevent their representations and warranties from raising concerns about significant liabilities of the HVCs.

148.    Among the material facts Defendants failed to disclose was the fact that the TEAM Trust was underfunded and that the Trust Documents state that Trust members are jointly and severally liable for all Trust deficiencies and obligations pursuant the Trust's Indemnification Agreement.

149.    Defendants further misled WCI by affirmatively stating that there were no outstanding liabilities of any trust or other fund like TEAM Trust.  Defendants further failed to disclose the Trust Documents, which explained the nature of the ongoing liability of the Trust members.

150.    At the time of the misrepresentations and omissions by Defendants, WCI was ignorant of their falsity and believed them to be true.

151.    WCI relied upon the misrepresentations made by Defendants.

152.    Had WCI been aware of the outstanding liabilities of the TEAM Trust, WCI would have taken actions to protect its position, including: negotiating a lower purchase price, seeking a large escrow to fund the TEAM Trust liability, including the Trust liability as an excluded liability (for which the former Shareholders would remain liable after the Closing), or deciding not to proceed with the purchase.

153.    Defendants' conduct constitutes the making of negligent misrepresentations (including negligent omissions of fact in connection with the statements that were made) under all applicable law.

154.     Neither WCI nor its agents knew of any of the falsity and/or misleading nature of Defendants' statements and omissions and, therefore, relied upon the misrepresentations made by Defendants.

155.     As a direct and proximate result of the negligent misrepresentations and omissions, and in reliance thereon, WCI suffered damages, in an amount to be proven at trial.

### COUNT VI: Fraud

### (as to All Defendants)

156.     WCI incorporates Paragraphs 1-155 as if fully set forth herein.

157.     Pursuant to the terms of the SPA, Defendants expressly warranted and represented that none of the HVCs had "any obligation or liability for any payment to any trust or other fund[,] with respect to unemployment compensation benefits, social security or other benefits for employees." At the time these representations were made, the HVCs had an existing obligation and liability to the TEAM Trust. These representations were false when made.

158.     Pursuant to the terms of the SPA, Defendants expressly warranted and represented that they had disclosed all material contracts and agreements including "indemnification agreements" and other agreements or commitments that "involv[e] or could result in aggregate payments" by the HVCs in any twelve-month (12-month) period of $250,000. On both the Signing Date and the Closing Date, Defendants failed to disclose the Trust Documents, including the By-Laws of the Trust, and the Indemnity Agreement. Further, SPA § 5.6(b) provided that the "Schedules shall be accurate and complete when delivered on or prior to the Signing Date." *See* SPA § 5.6(b). These representations were false when made.

159.     These misrepresentations and omissions were material as evidenced by the provision requiring Defendants to indemnify WCI for any and all Damages suffered or incurred by WCI in connection with or related to any misrepresentation or breach of any representation or warranty in the SPA.

24

160.     Defendants knew these representations were false when made and prior to and at the Closing.  In the alternative, Defendants recklessly made these representations without heed for their validity or made them under circumstances not justifying belief in their truth.

161.     WCI was ignorant of the falsity of these misrepresentations when they were made.

162.     Defendants intended for WCI to believe that the representations and warranties in the SPA were true.  Defendants intended WCI to execute the SPA in reliance on the representations and warranties in the SPA.  WCI was thereby deceived by Defendants' false representations and warranties.

163.     By reason of the fraud perpetrated by Defendants, and in justifiable reliance upon Defendants' misrepresentations and omissions in the SPA, WCI was induced to purchase the HVCs.

164.     Defendants' misrepresentations and omissions are the proximate cause of damages to WCI and WCI requests that the Court award it judgment against Defendants for an amount to be proven at trial.

## COUNT VII: Common Law Indemnification for Fees and Expenses Incurred
## (as to All Defendants)

165.     WCI incorporates Paragraphs 1-164 as if fully set forth herein.

166.     To the extent that WCI has paid any part of the TEAM Trust deficiency assessment to the State of New York, any such costs or liabilities, including attorneys' fees and expenses, are properly the obligation and responsibility of Defendants and solely the result of their breaches of the SPA.

167.     WCI therefore seeks indemnification from Defendants for the entirety of any costs or liabilities, including attorneys' fees and expenses, which WCI has suffered to pay in connection with any part of the TEAM Trust deficiency assessment to the State of New York.

## JURY DEMAND

Plaintiff WCI hereby demands a trial by jury on all issues of fact and damages stated herein.

**PRAYER FOR RELIEF**

      **WHEREFORE**, Plaintiff WCI respectfully requests that the Court:

A. As to Count I, award judgment for Plaintiff WCI and against Defendants for the actual damages resulting from Defendants' breach of contract in an amount to be proven at trial;

B. As to Count II, award judgment for Plaintiff WCI and against Defendant Earl for the actual damages resulting from Defendant Earl's breaches of contract in an amount to be proven at trial;

C. As to Count III, award declaratory judgment for Plaintiff WCI and against Defendants declaring and decreeing that Defendants are obligated pursuant to the SPA to indemnify WCI for all TEAM Trust deficits assessed against the HVCs by the New York WCB, such judgment to be binding on any subsequent deficit assessments or revisions issued by the WCB and to any further costs or damages WCI or any of the HVCs incurs or may incur related to deficit assessments issued by the WCB;

D. As to Count IV, award declaratory judgment for Plaintiff WCI and against Defendant Earl declaring and decreeing that Defendant Earl is obligated pursuant to the SPA to indemnify WCI for all TEAM Trust deficits assessed against the HVCs by the New York WCB, such judgment to be binding on any subsequent deficit assessments or revisions issued by the WCB and to any further costs or damages WCI or any of the HVCs incurs or may incur related to deficit assessments issued by the WCB;

E. As to Count V, award judgment for Plaintiff WCI and against Defendants for the actual damages resulting from Defendants' negligent misrepresentations in an amount to be proven at trial;

F. As to Count VI, award judgment for Plaintiff WCI and against Defendants for the actual damages resulting from Defendants' fraud in an amount to be proven at trial;

G.  As to Count VII, award judgment for Plaintiff WCI and against Defendants for any costs or liabilities, including attorneys' fees and expenses, which WCI or any of the HVCs has suffered to pay in connection with any part of the TEAM Trust deficiency assessment to the State of New York;

H.  Award Plaintiff WCI its attorneys' fees and costs incurred in connection with this action;

I.  Award Plaintiff WCI such other and further relief as the Court deems just and proper.

DATED: October 14, 2014

*Peter A. Lauricella_____*
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Peter A. Lauricella, Bar Roll #508669
677 Broadway
Albany, NY 12207
Tel: (518) 499-8893 / Fax: (518) 465-2548
Peter.Lauricella@wilsonelser.com


*Michael Murphy_____*
BEVERIDGE & DIAMOND, P.C.
Michael G. Murphy, Bar Roll #517904
477 Madison Avenue, 15th Floor
New York, NY 10022
Tel: (212) 702-5436 / Fax: (212) 702-5450
MMurphy@bdlaw.com

James B. Slaughter (*Pro Hac Vice Application To Be Filed*)
1350 I Street, NW Suite 700
Washington, DC 20005
Tel: (202) 789-6040 / Fax: (202) 789-6190
JSlaughter@bdlaw.com

Steven C. Sarno (*Pro Hac Vice Application To Be Filed*)
456 Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel: (415) 262-4015 / Fax: (415) 262-4040
SSarno@bdlaw.com

1093837v.1